# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **HENRY LUWISCH,** | **CIVIL ACTION** |
|     **Plaintiff** | |
| | |
| **VERSUS** | **NO. 17-3241** |
| | |
| **AMERICAN MARINE CORPORATION,** | **SECTION: "E" (5)** |
|     **Defendant** | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Henry Luwisch ("Luwisch"), brought a maritime personal injury claim against his employer, American Marine Corporation ("AMC"). Luwisch alleges that, on November 2, 2014, while working on the M/V American Challenger, he fell from the top deck to the second deck of the vessel and sustained injuries. Plaintiff's claims are brought pursuant to the Jones Act[1] and general maritime law for unseaworthiness and negligence. He seeks payment of past and future maintenance and cure, compensatory damages, punitive damages, and attorneys' fees.

The matter was tried before the Court, sitting in admiralty without a jury, over four days.[2] The Court heard testimony from Dr. Troy Beaucoudray, Robert Shahnazarian, Richard Wootton, Henry Luwisch, Dr. William Alden, Glenn Hebert, Dr. Randolph Rice, Dr. Everett Robert, Dr. Kenneth J. Boudreaux, Nancy T. Favaloro, Grady Fagan, and Dr. Bradley J. Bartholomew by deposition. The Court admitted into evidence Exhibits 1–75,[3] Court Exhibit 1, Court Exhibit 2,[4] Court Exhibit 3, and Court Exhibit 4.[5]

---

[1] 46 U.S.C. § 30104.
[2] R. Docs. 81, 82, and 83 (minute entries for proceedings on July 23, 24, and 25, 2018, respectively).
[3] R. Doc. 81.
[4] R. Doc. 82
[5] R. Doc. 83.

Having considered the testimony and other evidence at trial, the arguments of counsel, and the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. To the extent any findings of fact may be construed as conclusions of law, the Court adopts them as such. To the extent any conclusions of law may be construed as findings of fact, the Court adopts them as such.

## FINDINGS OF FACT

### I. Employment by AMC

Luwisch applied for work at AMC on January 12, 2012.[6] He was sent for his pre-employment physical on January 19, 2012. He was hired by AMC on January 26, 2012.[7] AMC is the owner and operator of the M/V American Challenger. Plaintiff was employed as a Chief Engineer aboard the M/V American Challenger as a member of its crew.[8]

Before Plaintiff was employed by AMC, Robert Shahnazarian, AMC's owner and president, interviewed Luwisch for about 30 minutes by telephone. Shahnazarian did not ask Luwisch any questions about his medical history or health and, instead, focused on Plaintiff's work history. Luwisch was sent, and completed and returned, only two pages of the AMC employment application package.[9] He did not complete the full Health Assessment ordinarily contained in AMC's Hiring Package[10] because it was not sent to him. The only health-related question Plaintiff answered on the two pages he completed was "Do you have any physical limitations that preclude you from performing any work

---

[6] Ex. 1 at 185.
[7] *Id.* at 184.
[8] Exhibit 58 is a photograph of the M/V Challenger.
[9] Ex. 1 at 185–86.
[10] Ex. 28.

for which you are being considered," to which he answered "no."[11] Plaintiff was not experiencing any physical limitations on his ability to do his job as a chief engineer at that time.

On page 186 of the application, Plaintiff listed his previous employers, but no one at AMC called any of them in connection with Plaintiff's employment. Plaintiff listed his references on page 190 of the application, and AMC contacted as many of the references as it could. Plaintiff listed "Captain Joe," his co-worker at Dale Martin Offshore, as a reference. AMC did not require Luwisch to complete the company's complete employment package before hiring him. As a result, AMC did not have a completed employment application from Luwisch at the time he was hired.[12]

AMC did require that Plaintiff have a pre-employment physical. On January 19, 2012, Luwisch had a physical examination at Boones Creek Medical Clinic in Tennessee.[13] A copy of the medical report was sent to AMC. In the "History" section of the report,[14] Luwisch disclosed to the nurse practitioner only his testicular cancer at age 26. Plaintiff failed to disclose that on October 29, 2011 he had an accident while he was working for Dale Martin Offshore. In that accident, Plaintiff was pulling on a wrench and fell against a bulkhead. Plaintiff had a medical examination soon after the accident and an MRI on November 14, 2011. The MRI showed moderate degenerative cervical disc disease at C4-5, small central spondylosis and bilateral foraminal stenosis at C5-6, and a herniated central left lateral disc herniation at core compression and left foraminal stenosis at C6-

---

[11] Ex. 1 at 185.
[12] The portion of the AMC pre-employment application completed by Luwisch before he was hired is contained in Exhibit 1, pp. 185–86.
[13] Ex. 29.
[14] *Id.* at 206-A.

7.[15] Plaintiff was provided the results of the MRI and told his healthcare providers that he was going home and would "follow up with orthopedist."[16] Plaintiff also failed to disclose to the nurse practitioner that he injured his left shoulder and suffered a brain injury in a four-wheeler accident in 2008. In the "Personal History Form" completed by Plaintiff, under "Past/Present Medical Problems," Plaintiff replied "None."[17]

Luwisch had worked for many maritime employers over his career and knew that it was common for employers to ask about prior medical history and prior neck and back injuries. He knew this information was important to prospective employers and that they would consider this information in deciding whether to hire him. Plaintiff was aware that AMC vessels are ocean-going, and the health of the crew is especially important to AMC for that reason.

Shahnazarian's daughter, Megan, AMC's recently appointed port captain, was the person who sent Luwisch the two pages of the company's employment application and who reviewed those two pages and the report from Boone's Medical Clinic.[18] Megan did not testify at the trial. Luwisch was hired by AMC and, shortly thereafter, he reported to the AMC office in California. While he was in California, Plaintiff filled out additional AMC paperwork, such as joining the union. Plaintiff testified that he also filled out the AMC employment application Health Assessment while in California but could not recall how he answered any of the questions. No copy of the completed Health Assessment was found in Plaintiff's AMC personnel file. The Court finds Plaintiff did not fill out the Health Assessment while he was in California or elsewhere.

---

[15] Ex. 37 at 571, Ex. 40.
[16] Ex. 39 at 811.
[17] Ex. 29 at 233.
[18] Ex. 1 at 185–86; Ex. 29.

Plaintiff's first assignment was on the M/V American Patriot, helping to put its engine back together. A few months later, Plaintiff received a commendation and a $3,000 bonus for his good work on this project.

## II.     The Accident

On November 2, 2014, the M/V American Challenger was between jobs and was standing by at the Resolve Marine dock in Theodore, Alabama. On November 2, 2014, the crew of the M/V American Challenger included Henry Luwisch and two other men, AB Jamie Gness and OS Gerard Arroyo. Plaintiff, as the chief engineer, was the senior officer on board the M/V American challenger on that day. The M/V American Challenger was not Henry Luwisch's regularly assigned vessel; he had worked on the vessel consistently for only a few months.

On November 1, 2012, there were lines shoreside that needed to be stored on the M/V American Challenger. The vessel's regular crew stowed other lines on the upper deck of the vessel. On the morning of November 2, 2014, Plaintiff discussed with the two deck hands how to get the additional rope to the upper deck. Luwisch ascended by ladder to the top deck of the M/V American Challenger to determine whether there was enough room there to store the rope. Luwisch had never been on this deck of the vessel before and had not seen the rope stored there. The deckhands stayed on the lower deck while Plaintiff climbed to the upper deck.

In order for Luwisch to access the upper deck of the M/V American Challenger, it was necessary for him to climb a permanently affixed ladder and disconnect the chain that was rigged across the opening in the upper deck's handrail where the top of the ladder

terminated.[19] Luwisch climbed the ladder without incident, disconnected the chain opening, stepped onto the upper deck and replaced the chain opening before conducting his inspection. Luwisch observed the rope stowed near the top of the ladder, partially blocking the walkway, with heavy 12 feet long boards on top of a portion of the rope.[20] Plaintiff was aware of the placement of the rope and recognized its presence as a hazard. After Luwisch surveyed the upper deck to try to identify a suitable location for the additional rope to be stored on the upper deck, he walked toward the ladder to return to the lower deck. He disconnected the chain opening, and, while preparing to descend the ladder, noticed a junction box near the handrail opening with a loose wire that required repair.[21] Because Plaintiff did not know whether electricity was running through this box and wire, he used his stop work authority to cease the rope stowage operation until he could repair the junction box to ensure that none of the workers received an electrical shock.[22] Plaintiff could not move the rope at the top of the ladder without removing the boards. It was not possible for Plaintiff to move the boards and rope by himself. It was not safe for the two deckhands to come to the upper deck and assist Luwisch in moving the rope or the boards until the junction box had been repaired.

It took Plaintiff four to five minutes to look around the deck, check the junction box, ascertain the tools he would need to perform the repair, and turn to descend the ladder. As he moved to descend the ladder, he tripped over the rope stowed near the top of the ladder and fell through the handrail opening some 10 feet to the lower deck. When

---

[19] Exhibit 58, page 30, depicts the top deck of the vessel on the day of the accident. Exhibit 44, page 1692 depicts the ladder.
[20] Exhibit 46, page 28 is a photograph of the rope.
[21] The junction box is visible in the top right-hand corner of Exhibit 58, page 29.
[22] The rope partially blocking the walkway at the top of the ladder can be seen in Exhibit 58, page 30.

Plaintiff fell, the right side of his body hit the paint locker sitting on the lower deck,[23] and he then bounced off the locker and hit the lower deck. He lost consciousness for a brief period of time. When he regained consciousness, Luwisch tried to get up and walk around but was limping, bleeding, and dizzy. He had an injury to his wrist, an injury to his knee, and a cut above his right ear. He also had pain in his knee.[24]

AMC did an investigation of the accident. The Incident Log and Actions corroborates Plaintiff's version of the accident.[25] There was no evidence that the placement of the rope at the top of the ladder arose from the ordinary and normal activities or risks of a seaman's work or that the condition was the result of an isolated negligent act.

Immediately after the accident, the deckhands took Plaintiff to the emergency room at Springhill Medical Center. Luwisch complained of moderate neck, shoulder and head pain, and groin pain beginning several minutes prior to arrival.[26] He reported that his pain was precipitated by a fall.[27] A CT scan performed at that time showed a protruding disc at C3-4, evidence of moderate degenerative disease at C4-5, a broad-based disc bulge at C5-6, and mild degenerative disc disease and a broad-based disc bulge at C6-7.

At that time, Plaintiff was living in Mexico and had no local lodgings. After leaving the hospital, he returned to the M/V American Challenger and stayed there three or four days so he would be able to return to Dr. Roca for follow-up medical care. When the vessel was leaving port to go offshore, Plaintiff was unable to stay on the vessel, so he went to

---

[23] The paint locker is depicted in Exhibit 58, page 28.
[24] Exhibit 44, pages 1699–703, depict the Plaintiff's injuries.
[25] Ex. 7.
[26] Ex. 30.
[27] *Id.* at 318.

Mexico to see his family. Soon thereafter, he returned to the United States for medical care. His follow up visit with Dr. Cesar Roca of the Alabama Orthopaedic Clinic on November 11, 2014 was limited, by AMC's instruction, to examination of his shoulder only. Dr. Roca noted that Luwisch's main complaint was his right shoulder injury but that he had also scraped his head and his right knee in the accident.[28]

## III.  Payment of Maintenance and Cure

November 20, 2014 was Plaintiff's last day of employment by AMC. When Luwisch informed his employer that he was not able to return to work, AMC started maintenance payments on December 10, 2014.[29] Payments continued without interruption until May 5, 2016.[30] In the beginning, Plaintiff received his maintenance checks at his mother's home in Zachary, Louisiana. In March 2015 he moved to Baton Rouge and began receiving his maintenance checks at a post office address in Baton Rouge.[31] Although Plaintiff continued to rent this post office box, he stopped receiving his maintenance checks in May 2016. AMC admits it had no basis to terminate Plaintiff's maintenance payments at that time.[32]

Plaintiff moved to Amelia, Louisiana in July or August 2016. He completed a forwarding mail request with the post office at that time. When he later went to work for Kim Susan, Plaintiff's mailing address was his brother's home in Larose, Louisiana. He again requested the post office forward his mail to his new address. Plaintiff has had the same cellphone telephone number from the time of the accident until today, but AMC

---

[28] Ex. 31 at 481.
[29] Ex. 3 at 2586.
[30] *Id.* at 2587; Court Ex. 4 at 2. Court Exhibits 1 through 4 appear in the record at R. Doc. 83.
[31] Ex. 16 at 864; Court Ex. 4 at 7.
[32] Court Exhibit 4.

never contacted him on that number to determine whether it was sending the checks to the correct address.

Shahnazarian, the president and 50 percent owner of AMC, testified repeatedly and falsely that Plaintiff's maintenance payments stopped in May 2016 because AMC did not know where to send the checks due to Plaintiff's disappearance. Shahnazarian testified that his employees told him that AMC could not find Luwisch, AMC could not get hold of him, he was out of touch, he was out of the country, and he was off the grid. Shahnazarian later testified that he was given this information by his "administration." Shahnazarian also testified that the checks sent to Plaintiff were returned to the company as undeliverable and that his employees assumed Plaintiff was in Mexico because they could not reach him, and there had been no response to their inquiries. Shahnazarian's testimony was not true.

During the trial, at the Court's direction, AMC provided the Court with what AMC originally represented to be the list of addresses to which AMC sent Plaintiff's maintenance checks.[33] The list was incomplete on its face, and Shahnazarian was unable to testify as to the source of the list or whether it was accurate. After the trial, and at the Court's insistence, on July 25, 2018 AMC provided the Court with Court Exhibit 4, which is an affidavit of Maricela Guzman with attachments. Only then did AMC's representative admit that in the first week of May 2016 Luwisch's health insurance through AMC was terminated and that Luwisch's weekly maintenance benefits were terminated without reason at the same time. Guzman represented in her affidavit that the termination was a clerical error but gave no explanation for how the error occurred and pointed to no

---

[33] Court Ex. 3.

evidence to establish that the termination was not intentional. Guzman did not testify at trial, and AMC did not seek to hold the record open to submit her testimony. If the Court had not required AMC to provide the material found in Court Exhibit 4, the Court would have been left with only the untruthful testimony of Shahnazarian with respect to the failure to pay Plaintiff's maintenance.

No maintenance checks were mailed to Plaintiff for the remainder of May 2016 through July 8, 2017.[34] On January 27, 2017, Plaintiff's counsel informed AMC's counsel, Richard Wootton, that Plaintiff was not receiving maintenance payments.[35] Neither Wootton nor anyone else at AMC offered the explanation that maintenance checks were being sent to Plaintiff but were being returned to the company. A $9,548.00 catch-up payment was mailed to Plaintiff through his attorneys on July 13, 2017, after this suit had been filed.[36] Payment of maintenance was restarted at that time.

AMC did not have an independent medical examination of Plaintiff until November 15, 2017. On that date, Dr. Robert examined Plaintiff and opined that Plaintiff did not need the surgery recommended by Dr. Bartholomew. Dr. Robert found that Plaintiff reached maximum medical improvement on December 20, 2017. AMC discontinued maintenance payments at that time.

### IV.     Plaintiff's Employment after the 2014 Accident

Plaintiff was employed as a mechanic first with Savard Labor and Professional Staffing from March 2015 through June 2015 and then with Aerial Access Equipment from June 2015 through December 2015. He then worked for All Star Automotive Group, attempting to be retrained as a Ford auto mechanic, but the long period for training and

---

[34] Court Ex. 4 at 2.
[35] Ex. 68 at 94.
[36] Ex. 67 at 3.

low wages caused him to leave this employment. He then worked as a mechanic for Gulf Coast Equipment Services from March 2016 through June 2016.

Plaintiff worked for Blackwater Diving as a chief engineer from July 9, 2016 through October 2016. In October 2016, Plaintiff went to work for Kim Susan, LLC ("Kim Susan") as a chief engineer at $425 per day. To get employment at Kim Susan, Plaintiff passed a physical examination, but not a full Coast Guard physical.[37] A full Coast Guard physical would have required a more rigorous agility test. Plaintiff had never failed a Coast Guard physical prior to the accident while he was working for AMC.

Luwisch was laid off by Kim Susan on December 31, 2016 but returned to work there from June 5, 2017 to May 9, 2018 at $325 a day. In connection with his return to work for Kim Susan, Plaintiff returned to see Dr. Roca in June of 2017 to get a release for his 2011 shoulder injury.

On his employment applications for Blackwater Diving and Kim Susan, Luwisch denied having a previous injury to his neck and denied recurrent neck and back pain because he feared he would not be employed if he reported these injuries.[38] Grady Fagan, Vice President for Human Resources for Kim Susan, testified that Plaintiff did a very good job while employed there and never complained about his physical condition. Plaintiff took only Advil, and no prescription pain medication, while he was working for Blackwater Diving and Kim Susan so that he could pass workplace drug tests. So long as the boat was not in the shipyard, Plaintiff was able to accomplish his job duties because he had an oiler to assist him with some of the heavier work. While the Kim Susan boat was in the shipyard, Plaintiff would not have had the assistance of an oiler but Plaintiff

---

[37] Ex. 22 at 838–42.
[38] Exs. 17, 22, 23.

was able to perform his duties because, while the vessel was in port, the port engineer was available to bring tools to the boat and do heavy repairs. Plaintiff's symptoms of migraines and numbness of his arm increased while he was working for Kim Susan.

Defendant produced a "Separation Notice Alleging Disqualification" dated May 30, 2018 and signed by Grady Fagan, the personnel manager for Kim Susan, but not by the Plaintiff.[39] The form notes "Retirement, pension" as the reason for Plaintiff's leaving. The Court takes judicial notice that the form is promulgated by the Louisiana Workforce Commission, Office of Employment Security, and is intended to be filled out by the employer to document that an employee has voluntarily left employment and is not eligible for unemployment benefits. The Separation Notice is not persuasive as to the reason Plaintiff left Kim Susan. Fagan testified that shortly before Plaintiff left he said he had purchased land in Georgia and he was ready to retire from oilfield work and start selling seafood and running a recreational vehicle park.

Until a couple of months before the trial Plaintiff was buying shrimp from boats and selling it on the roadside.

## V.     Plaintiff's Post-Accident Medical Treatment

In December 2014, Plaintiff began seeing Dr. William Alden in Marrero, Louisiana. He had complaints of migraine headaches, right shoulder pain and immobility, shooting pain and numbness in his left arm, and trouble sleeping. Plaintiff returned to Dr. Alden on February 13, 2015 complaining of the same symptoms. A cervical MRI was performed which revealed positive findings at the C4-5, C5-6, and C6-7 levels. The MRI of the right shoulder showed tears of the ventral and superior lips of the cartilaginous glenoid

---

[39] Ex. 24.

labrum.[40]  Dr. Alden worked on ocean-going ships after Katrina and was familiar with the duties of chief engineers. Dr. Alden testified that Plaintiff's ability to return to his previous employment was severely limited because Plainatiff would not be able to lift and carry equipment, climb ladders, open ports, or do the other activities an offshore chief engineer would be expected to do.  Dr. Alden also testified that, if Plaintiff returned to his previous work, it would exacerbate his cervical disc pathology and Plaintiff would not be able to tolerate the pain on a long-term basis.

Dr. Alden referred Plaintiff to Dr. Troy Beaucoudray, who was qualified as an expert in the field of neurology and pain management. Dr. Beaucoudray first saw Plaintiff on March 31, 2015. While being treated by Dr. Beaucoudray, Plaintiff received epidural steroid injections which gave him short-term relief. Dr. Beaucoudray ordered a third cervical epidural steroid injection for Plaintiff on February 16, 2016. Dr. Beaucoudray testified it was his opinion that to a reasonable degree of medical certainty the injuries suffered by Plaintiff were related to his fall on the M/V American Challenger. Dr. Beaucoudray was aware that on October 29, 2011 Plaintiff had an accident while he was working for Dale Martin Offshore and that Plaintiff had an MRI at that time. Dr. Beaucoudray compared the 2011 MRI to the MRI done in 2015. Dr. Beaucoudray testified it was his opinion that any injury from 2011 had been asymptomatic until the accident in 2014.  Dr. Beaucoudray recommended that Plaintiff remain off work, avoid any heavy lifting over ten pounds, and do no overhead work or no prolonged neck extension.

After administering conservative treatment to Plaintiff, which was unsuccessful, Dr. Beaucoudray recommended Plaintiff see Dr. Bradley Bartholomew for a surgical

---

[40] Ex. 33 at 83–87.

evaluation. Because he had not received significant relief, Plaintiff agreed. Dr. Bartholomew testified as an expert in the field of neurosurgery. Dr. Bartholomew first saw Plaintiff on October 22, 2015 for complaints relating to Plaintiff's neck. Dr. Bartholomew did not treat Plaintiff for any shoulder injury. Plaintiff complained to Dr. Bartholomew of neck pain, numbness, tingling down his left arm, and headaches. Dr. Bartholomew saw Plaintiff again on March 10, 2016 after Plaintiff had an epidural steroid injection by Dr. Beaucoudray but was not experiencing pain relief. Dr. Bartholomew discussed surgical options with Plaintiff and recommended an anterior cervical discectomy and fusion at C5-6, C6-7, with the artificial disks being done at C4-5. Dr. Bartholomew informed Plaintiff that he might need additional surgery in the future at the C6-7 level. Plaintiff indicated a desire to proceed with surgery.

Dr. Bartholomew provided an estimate of the surgical costs as $35,000 for his fee, $7,000 for his assistant, and hospital expenses from $50,000 to $75,000. Dr. Bartholomew next saw Plaintiff in January 2017 when Plaintiff reported that he was still having pain and that he had been approved for surgery. Dr. Bartholomew's surgery recommendation remained the same. Dr. Bartholomew scheduled Plaintiff's surgery for January 3, 2017. The surgery was never performed because AMC withdrew its approval.

Dr. Bartholomew's opinion is that Plaintiff had degenerative changes in his spine in 2011 and 2014. He compared Plaintiff's 2011 MRI to his post-accident MRI and found that after the accident the C4-5 level was worse, the edema in the bone at C5-6 and C6-7 looked a little better, and the C6-7 level looked worse with a further loss of disc space and that the disk was pushing back further. Dr. Bartholomew's opinion is that the degenerative changes seen in 2014 were asymptomatic and were exacerbated by the 2014 accident to the point at which they became symptomatic. Dr. Bartholomew's opinion is

that Plaintiff's symptoms were caused by the 2014 accident. Dr. Bartholomew observed changes on the 2014 MRI showing a worsening of Plaintiff's condition at two levels, C4-5 and C6-7.

The last time Dr. Bartholomew saw Plaintiff was on November 9, 2017. Plaintiff did not inform Dr. Bartholomew that he had been working during 2015, 2016, and 2017. Dr. Bartholomew's opinion at the time of his deposition on July 11, 2018 was that Plaintiff did not at that time need cervical surgery, as Plaintiff has been able to work and has been treating his symptoms with Advil for the last several years.

Plaintiff submitted to an independent medical examination by Dr. Everett Robert on November 15, 2017. Plaintiff told Dr. Robert that he was a chief engineer on a vessel that goes offshore and that he took Advil to relieve his symptoms. Dr. Robert found Plaintiff's findings on examination were normal and his opinion is that Plaintiff does not need cervical surgery.

Based on the testimony of Dr. Beaucoudray and Dr. Bartholemew, and their comparison of the pre-accident and post-accident MRIs, as well as the testimony of Plaintiff, the Court finds the 2014 accident exacerbated Plaintiff's pre-existing but asymptomatic cervical condition. Plaintiff testified that, before his 2014 accident, he had no physical limitations on his ability to do his job and was enjoying his work for AMC. Plaintiff also testified that, after the accident and up until the time of the trial, he was having migraine headaches, neck pain, difficulty sleeping, numbness and tingling in his left arm, and shooting pains down his left arm. Plaintiff testified that his symptoms interfered with his daily activities and worsened when he was doing the work of a chief engineer. Plaintiff also testified that he was particularly concerned about his ability to climb ladders, particularly if he was carrying a heavy object, because his left arm would

sometimes go numb and he would lose his strength. Although it is true Plaintiff worked for various maritime employers after the accident, he did so in pain and out of economic necessity, and he would not be able to do so long-term. The Court finds Plaintiff suffered a loss of future earning capacity as a result of the 2014 accident.

No doctor testified at trial that Plaintiff is in need of cervical surgery at this time. The Court credits the testimony of Dr. Bartholomew and Dr. Robert and finds Plaintiff does not need cervical surgery. The only evidence Plaintiff introduced with respect to future medical expenses was related to the surgery.

Plaintiff's past unpaid medical expenses total $17,489.92.[41]

## VI.    Plaintiff's Lost Wages and Fringe Benefits

Glenn Hebert, a certified vocational rehabilitation counselor, testified for Plaintiff.[42] Hebert has a master's degree in vocational counseling. He has been qualified as an expert in vocational rehabilitation in this district many times. Hebert spoke with the Plaintiff by telephone for forty-five minutes to an hour to ascertain Plaintiff's age, education, certifications, Coast Guard licenses, work history, and medical conditions. Hebert also reviewed the medical records of Plaintiff's treating physicians. Hebert is familiar with the duties of a chief engineer on a vessel and described them as keeping the vessel running, doing daily inspections and maintenance, lubricating the engines, changing the oil in the engines, dragging hoses that are 50 feet long and hooking them up to pump fuel, and chaining down equipment. He described the job classification as a heavy skilled position under Coast Guard regulations. According to Hebert, a chief engineer must be able to work in tight spaces in heat, crouched or kneeling for long

---

[41] Ex. 70–75.
[42] Ex. 66 (report of Glenn Hebert).

periods of time. Hebert's opinion is that Plaintiff could not pass a Coast Guard agility test or do the work of a chief engineer on an ongoing basis. It also is his opinion, based on his familiarity with labor markets and employment practices, that an employment candidate who is not allowed to do unrestricted heavy manual labor would not be hired as a chief engineer. As a result, Hebert's opinion is that Plaintiff has suffered a loss of earning capacity.

Based on the testimony of Plaintiff and his treating physicians, as well as his own training and experience, Hebert made a reasonable assumption that Plaintiff could not perform heavy manual labor after the accident. Hebert testified that as of May 2018, Plaintiff was employable but not as a chief engineer on a vessel. Hebert found the Plaintiff does have some transferable skills and is able to do some basic mechanical work and diagnostic testing on diesel engines, and supervise other workers working on engines or repair work on gas engines. Hebert is familiar with labor market surveys, including the hiring practices in the maritime industry, and uses them in his work. Based on his knowledge and experience, Hebert testified the pay for the sort of job Plaintiff is qualified to do is approximately $18.00 an hour.

Nancy Favaloro, a certified vocational rehabilitation counselor, examined Plaintiff for Defendant.[43] Favaloro testified it is her opinion that Plaintiff can return to his pre-accident employment as an offshore chief engineer.

The Court credits the testimony of Plaintiff, his doctors, and Hebert and finds that, as of May 2018, Plaintiff is not able to return his job as a chief engineer on offshore vessels

---

[43] Ex. 50 (reports of Nancy Favaloro).

and has suffered a loss of earning capacity. The Court further finds that Hebert would be able to return to work doing the lighter duty jobs described by Hebert at $18.00 an hour.

Dr. Randy Rice testified for Plaintiff as an expert in forensic economic loss calculation.[44] Dr. Kenneth Boudreaux testified for Defendant as an expert economist.[45] Both Dr. Rice and Dr. Boudreaux testified Plaintiff's work life expectancy on the date of the accident was 13.24 years. Both economists agreed his future life expectancy from the date of the trial, using the life expectancy table from the date of his accident, is 9.52 years. The Court accepts the economic experts' uncontested testimony regarding Plaintiff's work life expectancy.

Dr. Rice based his calculations on the assumption that Plaintiff would have continued to work through his life expectancy if the accident had not occurred, which the Court finds is a reasonable assumption and supported by the record evidence. Dr. Rice calculated the mid-point of Plaintiff's pre-accident wages was $142,271 and used this amount when calculating lost wages. This is a reasonable assumption, as Luwisch's earnings the year immediately prior to his accident were $142,343. Using this approach, Dr. Rice testified Plaintiff's lost wages from the time of the accident through the date of the trial was $257,009. Reducing this amount by the wages Luwisch actually received during this time results in a wage loss claim of **$241,293** through the time of trial.

Dr. Rice testified regarding Plaintiff's loss of future earnings, discounted by 0.70 percent. Dr. Rice testified that, under the assumption that Plaintiff would return to work at $18.00 an hour, Plaintiff's net future discounted after-tax wage loss is $867,613.

---

[44] Ex. 65 (report of Dr. Rice).
[45] Ex. 51 (reports of Dr. Boudreaux).

When the price of oil dropped precipitously in 2014, AMC's business was adversely affected and AMC was forced to cut wages. The wages of an employee such as Plaintiff would have been reduced from the $500 a day rate to $400 day. Dr. Rice did not take this economic downtown into account is estimating future lost wages. The Court finds Plaintiff's future wage and benefits losses should have been reduced to take this into account. The Court finds that it is reasonable to reduce the Plaintiff's loss of future earning capacity and loss of fringe benefits by 25 percent to account for the downturn in the oil and gas industry.

Dr. Rice testified that the present value of Plaintiff's future loss of fringe benefits in the form of health insurance coverage is $72,579 and the present value of his past and discounted future 401K matches and employer profit-sharing total $40,348. The Court will reduce these amounts by twenty-five percent to account for the downturn in the oil and gas industry.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides original jurisdiction over admiralty and maritime matters, Rule 9(h) of the Federal Rules of Civil Procedure, and the Jones Act.[46]

The matters before the Court include determination of whether AMC was negligent under the Jones Act, whether the vessel was unseaworthy under general maritime law, whether Plaintiff is entitled to compensatory damages under the Jones Act or general maritime law, whether Plaintiff is entitled to additional maintenance and cure benefits

---

[46] 46 U.S.C. § 30104, *formerly* 46 U.S.C. § 688.

above what has been paid, whether AMC is entitled to prevail on the *McCorpen* defense, and whether Plaintiff is entitled to punitive damages and attorneys' fees.

At the time of Plaintiff's injury, he was a seaman or member of the crew of the M/V American Challenger, which was at all pertinent times a vessel in navigation.[47] Luwisch was injured while in the service of the M/V Challenger.

A seaman who is injured while in the service of a vessel is owed maintenance and cure from his employer until such time as the seaman reaches maximum medical improvement.[48] A seaman's entitlement to maintenance and cure is not absolute. Importantly, Jones Act employers are "entitled to investigate a seaman's claim for maintenance and cure benefits."[49] Likewise, "an employer is allowed to rely upon certain legal defenses to deny these claims."[50] The defenses to maintenance and cure are "few and narrowly applied."[51] "Only some willful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection."[52] Such misconduct includes intoxication, venereal disease, and the willful concealment of a pre-existing medical condition.[53]

An injured seaman who willfully conceals from his employer a pre-existing medical condition may not be entitled to maintenance and cure.[54] In order to establish a defense under *McCorpen*, the defense must meet three criteria:

1. The claimant intentionally misrepresented or concealed medical facts or conditions;

---

[47] *Chandris v. Lewis*, 515 U.S. 347, 368 (1995).
[48] *Morales v. Garijak, Inc.*, 829 F.2d 1355 (5th Cir. 1987).
[49] *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005) (citing *id.* at 1358).
[50] *Id.*
[51] *Simon v. Can Do II, Inc.*, 89 F.3d 240, 242 (5th Cir. 1996).
[52] *Aguilar v. Standard Oil Co. of N. J.*, 318 U.S. 724, 731 (1943).
[53] *See id; Parker Drilling*, 410 F.3d at 171 (describing elements of so-called "*McCorpen* Defense").
[54] *Parker Drilling*, 410 F.3d at 171.

2. The non-disclosed facts were material to the employer's decision to hire the claimant; and

3. The concealed or withheld condition is the same or substantially similar to the injury complained of in the lawsuit.[55]

The employer bears the burden of proof as to each of the three prongs of the *McCorpen* defense.[56]

"Where the shipowner requires a seaman to submit to a pre-hiring medical examination or interview and the seaman intentionally misrepresents or conceals material facts, the disclosure of which is plainly desired, then he is not entitled to an award of maintenance and cure."[57] Failing to disclose medical information in an interview that is designed to elicit such information is enough to meet the intentional concealment prong.[58] The fact that an employer asks a specific medical question on an application and that inquiry is rationally related to the applicant's ability to perform his job duties renders the information material as a matter of law for the purpose of this analysis.[59] The requisite causal link between the preexisting injury and the injury supporting the lawsuit is established if the preexisting injury and the new injury are located in the same part of the body.[60]

AMC has established that it is entitled to the *McCorpen* defense in this case. Plaintiff was required to undergo a preemployment examination at Boones Creek Medical Clinic. Plaintiff intentionally concealed his 2008 ATV accident and his 2011 workplace accident during that medical examination when he revealed only his testicular cancer in

---

[55] *McCorpen v. Central Gulf S.S. Corp.*, 396 F.2d 547 (5th Cir. 1968).
[56] *Id.*
[57] *Id.* at 549.
[58] *See Hardison v. Abdon Callais Offshore, LLC*, No. CIV.A. 11-2053, 2012 WL 2878636, at *3–*4 (E.D. La. July 13, 2012), *aff'd sub nom. Hardison v. Abdon Callais Offshore, L.L.C.*, 551 F. App'x 735 (5th Cir. 2013).
[59] *Parker Drilling*, 410 F.3d at 175.
[60] *See id.* at 176–77.

the History section of the report and answered "None" to the Past/Present Medical Problems in the Personal History Form. The 2011 MRI showed degenerative disc disease, as well as herniation at the C6-7 level. The injury complained of now is herniation at the C6-7 level. AMC has proven it is entitled to the McCorpen defense and is relieved of its duty to provide maintenance and cure on these grounds. As a result, Plaintiff is not entitled to additional maintenance and cure, punitive damages or attorneys' fees.

Defendant AMC owed Luwisch, a seaman, a fundamental duty under the Jones Act to provide him with a reasonably safe place to work.[61] Plaintiff's burden is to establish that AMC not only had a duty to provide him a reasonably safe place to work, but that AMC also breached that duty, and AMC's negligence caused his injuries.[62]

The standard of causation under the Jones Act is whether the defendant's negligent conduct played any part, even the slightest, in producing the injury.[63] The causation burden of proof is "featherweight."[64] The standard of care is not "what the employer subjectively knew, but rather what it objectively knew or should have known."[65] A Jones Act employer is not liable when an injury arises solely from the ordinary and normal activities or risks of a seaman's work in the absence of direct proof that the injury complained of was caused by the act of negligence on the part of the employer.[66]

[61] *See Ivy v. Security Barge Lines, Inc.*, 585 F.2d 732 (5th Cir. 1978); *Bush v. Diamond Offshore Co.,* 46 F.Supp.2d 515, 520 (E.D. La. 1999) (Fallon, J).
[62] *See Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331, 338 (5th Cir. 1997).
[63] *Vendetto v. Sonat Offshore Drilling Co.*, 97-3103 (La. 1/20/99), 725 So. 2d 474, 479, *cert. denied*, 527 U.S. 1023 (1999).
[64] *Gavagan v. United States*, 955 F.2d 1016, 1019 (5th Cir. 1992).
[65] *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989) (quoting *Turner v. Inland Tugs Co.*, 689 F. Supp. 612, 619 (E.D. La. 1988)).
[66] *Massey v. Williams-McWilliams, Inc.*, 414 F.2d 675, 678–79 (5th Cir. 1969).

"The Fifth Circuit does not recognize the primary duty doctrine as a bar to recovery in a Jones Act negligence suit."[67] The primary duty doctrine is inapplicable in this case.

"[U]nder the Jones Act and the general maritime law, when the defendant's act aggravates or accelerates a pre-existing condition and renders a plaintiff unable to continue his work, or awakens a dormant condition that causes a plaintiff to experience pain when he did not suffer from pain or disability prior to the aggravation, the defendant can be liable in full for the disability caused."[68]

Under the Jones Act, a plaintiff may recover all of his pecuniary losses.[69] Pecuniary loss may include loss of earning capacity, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness.[70] The Fifth Circuit established the method for calculating future lost wages in maritime cases in *Culver v. Slater Boat Co.*[71] In that case, the court set forth a four-step process for determining lost wages as follows: (1) estimate the loss of work life or expected remaining work-life of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount that total to present value.

Evidence concerning economic conditions in the oil and gas industry and their effects on employers may be considered when determining future wage loss.[72]

Under the general maritime law, compensatory damages are those "that have resulted from the failure to pay, such as the aggravation of the seaman's condition,

---

[67] *Whitman v. Hercules Offshore Corp.,* Civ. A. No. 06-0229, 2006 WL 3718225 at *4 (W.D. La. Dec. 15, 2006).

[68] *Stevens v. Omega Protein, Inc.*, No. CIV.A.00-3326, 2005 WL 83248, at *7 (E.D. La. Jan. 13, 2005).

[69] *Cruz v. Hendy Int'l Co.*, 638 F.2d 719, 723 (5th Cir. 1981), *rev'd on other grounds by Michel v. Total Transp.*, Inc., 957 F.2d 186, 191 (5th Cir. 1992).

[70] *Daigle v. L & L Marine Transp. Co.*, 322 F. Supp. 2d 717, 730 (E.D. La. 2004).

[71] 722 F.2d 114 (5th Cir. 1983).

[72] *Book v. Nordrill, Inc.*, 826 F.2d 1457 (5th Cir. 1987).

determined by the usual principles applied in tort cases to measure compensatory damages."[73]

AMC failed to provide Plaintiff with a reasonably safe place to work and this failure was negligence partly responsible for Plaintiff's injuries. The rope being at the top of the ladder to the upper deck of the M/V Challenger, partially blocking the walkway, was a dangerous condition in the work place. The rope was routinely stored in that location by the vessel's regular crew and was not placed there by Plaintiff. Plaintiff had been working on the boat for several months and had never seen the rope on the upper deck. The rope had been in that position for an extended period of time. The placement of the rope directly contributed to Plaintiff's fall. The Court finds AMC was 80% contributorily negligent in causing the accident.

Luwisch was aware of the rope partially blocking the pathway at the top of the ladder and that it constituted a hazard. A seaman assigned to a vessel has the obligation under the general maritime law to exercise reasonable care for his own safety. A seaman such as Luwisch is obligated to act with ordinary prudence under the circumstances. This includes his reliance upon his employer to provide a safe work environment. The obligation of Luwisch is to act as a reasonable seaman in like circumstances.[74] Comparative fault is applicable to Jones Act negligence cases.[75]

The Plaintiff admitted he saw the rope when he ascended to the top of the ladder. Plaintiff also testified that he recognized the placement of the rope, partially in the walkway at the top of the ladder, as a hazard. Plaintiff's conduct contributed to the cause

---

[73] *Morales*, 829 F.2d at 1358.
[74] *Gautreaux*, 107 F.3d at 339.
[75] *Id.*

of the accident. The Court finds Luwisch was 20% contributorily negligent in causing the accident.

In addition to their duties to Luwisch under the Jones Act, AMC, as a vessel owner, had an obligation to provide a seaworthy vessel which is more or less fit for its intended purposes. A vessel is considered unseaworthy unless all its appurtenances and crew are reasonably fit and safe for their intended purposes.[76] Unseaworthiness results from a defective condition and is not the result of an isolated negligent act.[77]

Unseaworthiness must be the result of a condition that persists for such a time as to become related to the status of the vessel.[78] A plaintiff asserting a claim of unseaworthiness need not establish negligence but bears the burden to show that the "unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."[79] "The owner's duty to furnish a seaworthy vessel is absolute and completely independent of the duty under the Jones Act to exercise reasonable care."[80] An improperly coiled or stored rope may constitute unseaworthiness.[81]

The credible evidence supports the finding that the M/V Challenger was not fit for its intended purpose. The placement of the rope at the top of the ladder to the upper deck of the M/V Challenger rendered the vessel unseaworthy. The condition did not arise from

---

[76] *Foster v. Destin Trading Corp.*, 96-0803 (La. 5/30/97), 700 So. 2d 199, 202.
[77] *Meyers v. M/V EUGENIO C*, 842 F.2d 815 (5th Cir. 1988); *Daughdrill v. Ocean Drilling and Exploration Co. (ODECO),* 709 F. Supp. 710 (E.D. La. 1989).
[78] *Kyzar v. Vale Do Ri Doce Navegacai, S.A.,* 464 F.2d 285, 290 (5th Cir. 1972).
[79] *Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992).
[80] *Graham v. Offshore Specialty Fabricators, Inc.*, 2009-0117 (La. App. 1 Cir. 1/8/10), 37 So. 3d 1002, 1010 (citation omitted).
[81] *Turner v. Niagara Frontier Trans. Auth.*, 748 S. Supp. 80, 84 (W.D.N.Y. 1990).

the ordinary and normal activities or risks of a seaman's work and the condition was not the result of an isolated negligent act. This unseaworthy condition played a substantial part in causing Plaintiff's injury, and the injury was a reasonably probable consequence of the unseaworthiness.

Plaintiff's pre-existing degenerative disc disease in his cervical spine was not symptomatic prior to his November 2, 2014 accident. Competent medical testimony, diagnostic imaging, and Plaintiff's testimony proved that Luwisch's cervical spine injury was exacerbated by this accident. AMC is liable for damages resulting from this exacerbation.

Plaintiff is entitled to recover his past wage loss and his loss of future earning capacity, as well as his future loss of fringe benefits and his past and future loss of retirement contributions.

Plaintiff is entitled to recover his past medical expenses.

As Plaintiff does not need cervical surgery and presented no evidence regarding other future medical expenses, he is not entitled to recover future medical expenses.

Plaintiff is entitled to recover damages for his past and future pain and suffering.

Prejudgment interest is awarded almost as a matter of course in cases where there is liability for unseaworthiness under the general maritime law.[82] "It is generally accepted that, under maritime law, the award of prejudgment interest is 'well-nigh automatic.'"[83] The trial court has discretion to deny prejudgment interest "only where peculiar circumstances would make such an award inequitable."[84] Peculiar circumstances may be

---

[82] *See Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026, 1028 (5th Cir. 1986); *Ceja v. Mike Hooks, Inc.*, 690 F.2d 1191, 1196 (5th Cir. 1982).
[83] *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 215 (5th Cir. 2006) (quoting *Reeled Tubing*, 794 F.2d at 1028).
[84] *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 204 (5th Cir. 1995).

found "where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by plaintiff."[85] There are no such peculiar circumstances in this case. Admiralty courts "may look to state law and other reasonable guideposts" to determine the rate of prejudgment interest.[86] Accordingly, prejudgment interest will be assessed at the Louisiana legal interest rate. The Court awards pre-judgment interest from the date of loss, which in this date is the date of the injury, on past medical expenses, past lost wages, past retirement contributions which the Court estimates at $10,000.00, and past pain and suffering.

Post-judgment interest on future losses will accrue at the federal rate.

## CONCLUSION

Based on the above Findings of Fact and Conclusions of Law, the Court finds that Plaintiff is entitled to recover the following damages, plus applicable interest:

| | |
|---|---|
| Past medical expenses | $ 17,489.00 |
| Past wage loss | $ 241,293.00 |
| Loss of Future Earning Capacity | $ 650,709.00 |
| Loss of Future fringe benefits | $ 54,434.00 |
| Loss of Past and Future retirement contributions | $ 30,261.00 |
| Past Pain and suffering | $ 40,000.00 |
| Future Pain and suffering | $ 50,000.00 |

---

[85] *Reeled Tubing*, 794 F.2d at 1028.
[86] *Todd Shipyard Corp. v. Auto Transp., S.A.*, 763 F.2d 745, 753 (5th Cir. 1985).

Total                                                    $ 1,084,186.00

Total reduced by 20% contributory negligence:        $    867,348.80

      The Court will enter a judgment by separate order.

      **New Orleans, Louisiana, this 31st day of March, 2019.**

                                      **SUSIE MORGAN**
                              **UNITED STATES DISTRICT JUDGE**